# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS

```
* * * * * * * * * * * * * * * * * * * * * * * *
MONIKA CLARKE, parent and next      *
friend of F.C., a minor,            *        No. 20-1400V
                                    *
           Petitioner,              *
                                    *        Special Master Christian J. Moran
v.                                  *
                                    *        Filed: March 27, 2026
SECRETARY OF HEALTH                 *
AND HUMAN SERVICES,                 *
                                    *
           Respondent.              *
* * * * * * * * * * * * * * * * * * * * * * * *
```

Richard Gage, Richard Gage, P.C., Cheyenne, WY, for petitioner;
Benjamin Warder, United States Dep't of Justice, Washington, DC, for respondent.

### PUBLISHED DECISION DENYING ENTITLEMENT TO COMPENSATION[1]

Monika Clarke alleges that various childhood vaccines caused her daughter, F.C., to develop epilepsy. She seeks compensation pursuant to the National Childhood Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10 et seq. Ms. Clarke retained one pediatric neurologist, Yuval Shafrir, who has written reports on her behalf. Ms. Clarke advocated through two briefs.

The Secretary denies that Ms. Clarke is entitled to compensation. The Secretary retained two doctors. The first is Andrew MacGinnitie, an immunologist. The second is Gregory Holmes, who is a pediatric neurologist. The Secretary supported a denial of compensation through one brief.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). This means the Decision will be available to anyone with access to the internet. In accordance with Vaccine Rule 18(b), the parties have 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. Any changes will appear in the document posted on the website.

The evidence does not preponderate in favor of compensation. One problem is that Dr. Shafrir has much less experience than Dr. MacGinnitie in the field that most closely studies how vaccines affect the human body, immunology. This disparity in qualifications makes crediting any of Dr. Shafrir's opinions on immunology over competing opinions from Dr. MacGinnitie difficult. Potentially relatedly, Dr. Shafrir's attempts to present a coherent theory to explain how a relevant vaccine can cause epilepsy were difficult to understand and, therefore, lacked persuasiveness. Accordingly, the Clerk's Office is instructed to enter judgment in accord with this decision.

## I.    **Facts**

Events in F.C.'s life are not disputed and are straightforward. Thus, this decision does not set out the facts at length. For a longer presentation of factual material, see Exhibit 12 (Dr. Shafrir's first report) at 1-10.

F.C. was born in April 2017. The preceding pregnancy and birth were normal and do not affect the claim for compensation. F.C. received childhood vaccines around two-months and four-months without any reported effects. Exhibit 2 at 29 (Aug. 24, 207), 33 (June 27, 2017), and 35 (May 26, 2017).

F.C. received another set of childhood vaccines around six-months on November 7, 2017. More specifically, F.C. received the diphtheria-tetanus-acellular pertussis ("DTaP"), inactivated polio, Haemophilius influenzae, pneumococcal, and Rota vaccines. Exhibit 1 at 2; see also Exhibit 8 (Ms. Clarke's affidavit) ¶ 3. Ms. Clarke's claim rests upon the DTaP vaccine.

Five days later, Ms. Clarke noticed that F.C. "wasn't tracking her eyes[.] [S]he was just blank staring to the one side." Exhibit 4 at 2-3. Ms. Clarke called an ambulance, which brought her to an emergency room at a local hospital. When F.C. arrived in the emergency department, two nurses and a doctor were waiting to assess her. At that time, a nurse recorded: "[F.C.] cries when RN touches [her] but is easily consolable by parents." Exhibit 10 at 9. The emergency department doctor obtained a history providing more details:

> Mother states that she was holding the baby when she began staring off in one direction. Mother could not get her to track to her or anything else in the room. Shortly after the baby went limp and mother says she 'lost her color'. Mother does not think she stopped breathing. Mother estimates that the symptoms did not resolve until at least 3-4 minutes later though she is now back to herself. Mother states that nothing like this has ever happened before however father notes that earlier today patient had an episode where she went limp for him as well. He convinced himself that she had just 'fallen asleep funny' but is now questioning whether or not this was a similar but less intense event. She did not lose color at that time. Patient is otherwise healthy. She had a URI 2 weeks ago but has not been ill recently.

Id. at 11-12.

2

The doctor was concerned because F.C. may have had two neurologic events in the same day.  Thus, the doctor arranged to transfer F.C.'s care to Children's Hospital of Philadelphia ("CHOP").

F.C. stayed at CHOP for one overnight, arriving on November 12, 2017 and being discharged on November 13, 2017.  The resident and attending doctor obtained a history, which is more or less in accord with the history above, although slightly more detailed.  See Exhibit 2 at 45-46.  Additional details included more information about F.C.'s recent health status:  "Had a URI about 2.5 weeks ago but that resolved.  No recent fevers or other cold symptoms.  No diarrhea.  Had some constipation with starting solids but that improved.  No change in urine output."  Id. at 46.

While in CHOP, a neurologist saw F.C. and ordered an EEG.  The EEG was normal.  Exhibit 2 at 52.  The neurologist wrote: "Episodes are concerning for possible seizure given reported eye deviation and limp tone.  However, development, neurologic exam, and EEG were all reassuring."  Id.

After discharge, F.C. periodically saw a pediatrician and neurologist, who monitored her neurologic progress.  Fortunately, in an April 4, 2018 visit to the pediatrician, Ms. Clarke reported that F.C.'s "last seizure was in the beginning of February."  Exhibit 2 at 19.  F.C. remained on an anti-seizure medication, Keppra.

In a July 23, 2019 follow up appointment at CHOP, a neurologist reviewed information, including a video the parents had created.  The doctor stated: "Taken together it is now clear that [F.C.] has a seizure disorder."  Exhibit 11 at 10.  After another EEG, which was normal, the dose of Keppra was tapered.  See id. at 5.  By August 25, 2020, F.C. was not taking any anti-seizure medication.  Id. at 3.

## II.    Procedural History

The procedural history is not controversial.  For sake of organization, it is divided into three parts.

### A.    Events before Expert Reports

Ms. Clarke initiated this litigation by filing her petition on October 15, 2020.  It alleged that the vaccines caused F.C. to suffer a seizure disorder.  Pet., filed Oct. 15, 2020, ¶ 10.  The petition did not assert a Table claim.  She periodically filed medical records and affidavits.

The Secretary reviewed this material and recommended against an award of compensation.  Resp't's Rep., filed June 17, 2021.  The Secretary's analysis consisted of two sections.  First, although the petition did not claim that F.C. suffered an injury listed on the Vaccine Table, the Secretary argued that F.C. had not suffered an encephalopathy.  Id. at 11-12.  Next, for the alternative claim, a claim that a vaccine was the cause-in-fact of F.C.'s seizure disorder, the Secretary commented that Ms. Clarke lacked support from an expert.  Id. at 12-14.

Because it appeared that the parties were likely to seek reports from an expert, a set of draft instructions were issued.  Order, issued July 1, 2021.  After Ms. Clarke interposed some

objections, the instructions became final.  See Order, issued Aug. 17, 2021 (addressing petitioner's objections).

### B.      Retained Experts and Their Reports

#### 1.      Yuval Shafrir and his First Report[2]

Background.  Dr. Shafrir has participated in the Vaccine Program for many years.  At first, the Secretary retained him.  See, e.g., Raj v. Sec'y of Health & Hum. Servs., No. 96-294V, 2001 WL 963984 (Fed. Cl. Spec. Mstr. July 31, 2001).  More recently, Dr. Shafrir has offered opinions on behalf of petitioners.  See, e.g., Mohamad v. Sec'y of Health & Hum. Servs., No. 16-1075V, 2022 WL 711604 (Fed. Cl. Spec. Mstr. Jan. 27, 2022), mot. for rev. denied, 2024 WL 4943421 (Fed. Cl. 2024), appeal dismissed, No. 2025-1370, 2025 WL 1341189 (Fed. Cir. May 8, 2025).

Dr. Shafrir graduated from medical school in Israel in 1982.  He stayed in Israel for a few years for residencies in pediatrics.  In 1986, Dr. Shafrir came to the United States (New York) where he completed a residency in pediatrics at North Shore University Hospital.  Dr. Shafrir became board certified in pediatrics in 1991, but he did not seek recertification in pediatrics after 1998.

In July 1988, Dr. Shafrir started a residency and fellowship in pediatric neurology at Washington University, which he finished in 1991.  He then had a pediatric neurophysiology and epileptology fellowship at Miami's Children's Hospital.  He became board certified in neurology and psychiatry in 1993.

From 1995-2000, Dr. Shafrir acted as an assistant professor and then an associate professor of neurology first at Georgetown University and then the University of Oklahoma.  After this aspect of his academic career ended, Dr. Shafrir taught residents and medical students at Sinai Hospital.  He has written about 14 articles that have been published in peer-reviewed journals.

First Report. After describing his qualifications in one paragraph, Dr. Shafrir's report opens with a recitation of events in F.C.'s medical history, ending in April 2019.  Exhibit 12 at 1-10.  He interpreted the medical records as showing that F.C. suffers from a "chronic seizure disorder."  Id. at 10.

Dr. Shafrir opined that the DTaP vaccine caused the onset of F.C.'s epilepsy.  Consistent with the Expert Instructions, he discussed each of the prongs set out in Althen v. Sec'y of Health and Hum. Servs., 418 F.3d 1274 (Fed. Cir. 2005).  For a theory to connect how the DTaP vaccine can cause epilepsy, Dr. Shafrir set out two, potentially overlapping, theories.  Exhibit 12 at 10-15.  One theory involves the innate immune system and cytokines.  The other theory involves molecular mimicry, which Dr. Shafrir sees as supported by autoimmune epilepsy.

---

[2] Information about Dr. Shafrir's background can be found in his curriculum vitae, which is Exhibit 13.

For a logical sequence of cause and effect, Dr. Shafrir wrote approximately one page. This one page, however, does not contain any information specific to F.C.  See Exhibit 12 at 15-16.

For the last Althen prong, Dr. Shafrir stated that the interval between vaccination and the onset of seizures was appropriate.  He analogized F.C.'s epilepsy to encephalopathy, which appears on the Vaccine Injury Table associated with vaccines containing pertussis.

2.    Andrew MacGinnitie and his First Report[3]

Background.  The Secretary has retained Dr. MacGinnitie since 2015.  Dr. MacGinnitie has not, to the undersigned's awareness, offered any opinions on behalf of a petitioner in the Vaccine Program.

Dr. MacGinnitie graduated from the Pritzker School of Medicine of the University of Chicago in 1998.  Two years earlier, he had earned a Ph.D. from the same institution in pathology.  He was a resident in pediatrics, a fellow in allergy / immunology, and a clinical fellow in pediatrics.  He has board-certification in pediatrics (2001 and 2011) as well as allergy and immunology (2003 and 2013).

Dr. MacGinnitie has held various academic positions in pediatrics at the University of Pittsburgh, Harvard Medical School, and the Medical College of Wisconsin.  He is an ad hoc reviewer for multiple publications that focus on immunology.  He has published more than 30 articles in peer-reviewed journals.

First Report. Like Dr. Shafrir, Dr. MacGinnitie began his first report with an overview of his qualifications, a statement of the material he reviewed, and a summary of events in F.C.'s medical record.  As to F.C.'s diagnosis, Dr. MacGinnitie largely deferred to Dr. Holmes. However, Dr. MacGinnitie agreed that F.C. "suffered from a number of seizures starting in the week after receipt of vaccinations on November 7, 2017."  Exhibit A at 6.  Dr. MacGinnitie noted that these seizures "responded to treatment with anti-seizure medication."  Id.

Dr. MacGinnitie's primary role was to assess the causal theories offered by Dr. Shafrir. Dr. MacGinnitie wrote: "I struggled to follow a logical step-by-step theory of causation in Dr. Shafrir's report.  He describes how the innate immune system can be activated by vaccination, but then proposes that FC's seizures were triggered by molecular mimicry causing autoimmunity, processes which are mediated by the adaptive arm of the immune system." Exhibit A at 6.

Dr. MacGinnitie challenged aspects of a theory based upon the innate immune system (cytokines).  For example, the blood-brain barrier would hinder the entry of any cytokines produced in response to a vaccination in F.C.'s body into the central nervous system.  Exhibit A at 6-9.

---

[3] Dr. MacGinnitie's curriculum vitae is Exhibit I.

Dr. MacGinnitie also disagreed with the parts of the theory involving the adaptive immune system (antibodies).  Dr. MacGinnitie addressed the commonness of homology and that there was no evidence for an autoimmune process in F.C.  Dr. MacGinnitie maintained that the timing was too fast for an autoimmune process to cause F.C. to develop seizures within about three days of the vaccination.  Exhibit A at 9-14.

Dr. MacGinnitie made a few more general points.  In his view, based upon an article by Huang and others[4], the DTaP vaccine is not associated with increased seizures.  Exhibit A at 10-11.  Dr. MacGinnitie also noted that the doctors who treated F.C. did not say a vaccine caused her seizures.  Id. at 13.

### 3. Gregory Holmes and his First Report[5]

Background.  Dr. Holmes graduated from the University of Virginia School of Medicine in 1974.  He completed an internship and residency in Pediatrics at Yale University School of Medicine.  He also had a residency in pediatric neurology at the University of Virginia School of Medicine, completing it in 1979.  Dr. Holmes became board-certified in pediatrics in 1979 and in psychiatry and neurology the following year.

Starting in 1979, Dr. Holmes held different academic positions at different medical schools.  Since 2013, Dr. Holmes has worked as a professor in the Larner College of Medicine in the University of Vermont.

Dr. Holmes describes his area of interest as primarily childhood epilepsy.  He has written more than 400 articles published in peer-reviewed journals.  In his report, Dr. Holmes stated that he is currently following 600-700 patients with epilepsy.

First Report.  As with the other experts, Dr. Holmes set out his qualifications and F.C.'s medical history.  Exhibit C at 1-6.  Dr. Holmes discussed epilepsies for roughly two paragraphs.  Id. at 6.

Citing a report by the Institute of Medicine, Dr. Holmes opined that "there is no evidence linking any of these vaccines with epilepsy."  Exhibit C at 6.  With regard to the opinions that Dr. Shafrir asserted, Dr. Holmes stated that: "There is no indication that the DTaP [vaccine] caused 'an immune attack on protein components of [F.C.'s] brain.'"  Id. at 7, quoting Exhibit 12 (Dr. Shafrir's report) at 12.  Dr. Holmes cited an article by Jehan Suleiman and Russell C. Dale[6] to set out the diagnostic criteria for autoimmune epilepsy.  Dr. Holmes opined that F.C. did not have autoimmune epilepsy.

---

[4] Wan-Ting Huang et al., Lack of Association Between Acellular Pertussis Vaccine and Seizures in Early Childhood, 126 PEDIATRICS 263 (2010); filed as Exhibit A, Tab 9.

[5] Dr. Holmes's curriculum vitae is Exhibit D.

[6] Jehan Suleiman and Russell C. Dale, The recognition and treatment of autoimmune epilepsy in children, 57 DEV. MED. CHILD. NEUROL. 431 (2015); filed as Exhibit C, Tab 5.

Dr. Holmes concluded that "FC had a short-lived benign course of epilepsy. There is not evidence that the vaccines FC received on 11/07/2017 were the likely cause of her neurological condition." Exhibit C at 11.

### 4.    Dr. Shafrir's Second Report

Dr. Shafrir attempted to respond to both Dr. MacGinnitie and Dr. Holmes. In response to Dr. MacGinnitie, Dr. Shafrir stated that although F.C. suffered from an encephalopathy briefly, she did not have encephalitis. Exhibit 50 at 2.[7] He disputed Dr. MacGinnitie's opinion with respect to the protection afforded by the blood-brain barrier. After Dr. MacGinnitie had asserted that there was no evidence of autoimmunity in F.C., Dr. Shafrir responded that: "My theory of causation presented in my initial report, does not require systemic autoimmunity." Id. at 4. However, Dr. Shafrir also wrote one paragraph under the heading of "Molecular mimicry is an unlikely explanation for FC's symptoms." But, this paragraph largely fails to respond to Dr. MacGinnitie's criticisms. At best, Dr. Shafrir stated that "the presence of the homologies makes the induction of autoimmunity for molecular mimicry feasible." Id.

For the theory based upon the innate immune system, Dr. Shafrir referred to a disease known as febrile illness related epilepsy syndrome ("FIRES"). As to timing, Dr. Shafrir wrote that: "It is quite likely that in the early phases of her reaction, immediately following the vaccination, the innate immune system components, such as cytokines, played a major role in her symptoms." Exhibit 50 at 8.

Dr. Shafrir also addressed the Huang article, arguing that "the study had serious limitations" such as the reliance on diagnostic codes and the possibility that large epidemiologic studies are inadequate to identify rare reactions. Exhibit 50 at 4-5. Dr. Shafrir also pointed out that F.C.'s treating doctors did not express an opinion one way or the other as to the cause of her seizures. Id. at 8.

In response to Dr. Holmes, Dr. Shafrir stated that the IOM determined that "'the evidence was inadequate to accept or to reject a causal relationship between diphtheria toxoid-, tetanus toxoid-, or acellular pertussis-containing vaccine and seizures.'" Exhibit 50 at 9, quoting Exhibit C-3 at 543.

As to the question of diagnosis, Dr. Shafrir recognized that he did not claim that F.C. suffered from "autoimmune encephalitis." Exhibit 50 at 9. Instead, F.C. "had autoimmune epilepsy." Id. at 11. Dr. Shafrir added: "Autoimmune epilepsy does not necessarily have features of autoimmune encephalitis, and it can be mild as in FC['s] case." Id.

Dr. Shafrir concluded: the criticisms by Dr. MacGinnitie and Dr. Holmes "do not change the facts in the case. The role of autoimmunity and inflammation in epilepsy is still a work in progress, but my theory is solidly based on current medical literature." Exhibit 50 at 11.

---

[7] While Dr. Shafrir stated that F.C. had an encephalopathy, he did not assert that F.C. fulfilled the regulatory definition of an acute and chronic encephalopathy.

### 5.    Dr. MacGinnitie's Second Report

Dr. MacGinnitie began his second report with an overview that described some of the problems in responding to the theories that Dr. Shafrir has offered:

> I do not believe that Dr. Shafrir has presented a logical theory of causation, but my interpretation is that he is proposing there are two distinct mechanisms by which vaccination led to FC's seizures. First, that the immediate production of cytokines after vaccination led to central nervous system ("CNS") inflammation and seizures. Second, molecular mimicry between components of the diphtheria, tetanus, and acellular pertussis ("DTaP") vaccine that FC received, and proteins in the human CNS led to the development of antibodies that recognized her neural tissue, which led to her ongoing seizures. However, Dr. Shafrir provides no details.

Exhibit E at 1.

As a general point, Dr. MacGinnitie explained the difference between inflammation and autoimmunity. Dr. MacGinnitie further asserted that "Dr. Shafrir overlooks this distinction." Exhibit E at 2.

For the cytokine-based theory, Dr. MacGinnitie disagreed with Dr. Shafrir's reliance on FIRES because, in part, "FC would not meet the requirements for a diagnosis of FIRES because there is no record of fever, from infection or otherwise, preceding onset of her seizures." Exhibit E at 2. Dr. MacGinnitie also asserted that "there is no evidence of either generalized or localized inflammation." Id. at 3.

For the antibody-based theory, Dr. MacGinnitie stated that Dr. Shafrir "provides no details as to how autoimmunity could have triggered FC's seizures (e.g., whether antibodies or T-cells are involved, what antigens are targeted, etc.)." Exhibit E at 3. Further, relying upon an article by Lisa K. Peterson and Robert S. Fujinami[8], Dr. MacGinnitie opined that Dr. Shafrir had not provided any evidence that molecular mimicry can explain how a vaccine can cause epilepsy. Dr. MacGinnitie again asserted that an autoimmune disease does not develop within three days of an inciting event. Id. at 4.

### 6.    Dr. Holmes's Second Report

This report is relatively short, about three pages. Dr. Holmes maintained that F.C. does not have autoimmune epilepsy. Exhibit F.

---

[8] Lisa K. Peterson and Robert S. Fujinami, Molecular Mimicry, in AUTOANTIBODIES (Yehuda Shoenfeld et al. eds., 2d ed. 2007); filed as Exhibit E, Tab 2.

7.      Dr. Shafrir's Third Report

Dr. Shafrir responded to Dr. Holmes and Dr. MacGinnitie. For Dr. Holmes, who disputed the diagnosis of autoimmune epilepsy, Dr. Shafrir did not contest Dr. Holmes's statement that there is no evidence for autoimmune epilepsy. Dr. Shafrir opined that the lack of evidence is because the physicians at CHOP did not look for evidence of autoimmune epilepsy. The lack of evidence "does not mean that patients with milder epilepsy do not have autoimmune factors in the causation and the persistence of their epilepsy." Exhibit 71 at 2.

For Dr. MacGinnitie, Dr. Shafrir stated that he cited FIRES "as an example of cytokines driven epileptic encephalopathy which can appear without other clinical signs of inflammation, up to 2 weeks after an infection." Exhibit 71 at 2.

As to Dr. MacGinnitie's criticisms of molecular mimicry, Dr. Shafrir wrote a single sentence. Dr. Shafrir stated: "I described the brain protein candidates which share homologies with components of the vaccines that FC received in great details in my first report (paragraph f on page 14 in my first report), and submitted Exhibits 40-46 with my first report to support it." Exhibit 71 at 3.

Dr. Shafrir again concluded that F.C. "meets the Althen criteria, based on the contemporaneous medical records and medical literature in the field. My theory is solidly based on current medical literature." Id. at 4.

C.      Briefing

Dr. Shafrir's third report was the final expert report. See Resp't's Status Rep't, filed June 29, 2023 (declining to present additional expert reports). The parties were direct to file briefs.

The parties advocated through briefs. Ms. Clarke filed her primary brief on May 31, 2024 and her reply on September 30, 2024. In between, the Secretary submitted his brief on August 22, 2024. With the submission of Ms. Clarke's reply, the matter is ready for adjudication.[9]

III.    **Standards for Adjudication**

A petitioner is required to establish her case by a preponderance of the evidence. 42 U.S.C. § 300aa–13(1)(a). The preponderance of the evidence standard requires a "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the judge of the fact's existence." Moberly v. Sec'y of Health & Hum. Servs., 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (citations omitted). Proof of medical certainty is not required. Bunting v. Sec'y of Health & Hum. Servs., 931 F.2d 867, 873 (Fed. Cir. 1991).

---

[9] Both Ms. Clarke's primary brief and the Secretary's brief are commendable for their comprehensive discussion of medical literature.

Distinguishing between "preponderant evidence" and "medical certainty" is important because a special master should not impose an evidentiary burden that is too high. Andreu v. Sec'y of Health & Hum. Servs., 569 F.3d 1367, 1379-80 (Fed. Cir. 2009) (reversing special master's decision that petitioners were not entitled to compensation); see also Lampe v. Sec'y of Health & Hum. Servs., 219 F.3d 1357 (Fed. Cir. 2000); Hodges v. Sec'y of Health & Hum. Servs., 9 F.3d 958, 961 (Fed. Cir. 1993) (disagreeing with dissenting judge's contention that the special master confused preponderance of the evidence with medical certainty).

## IV.    Elements of a Claim

The Vaccine Act requires that petitioners establish five elements.  42 U.S.C. § 300aa–11(c)(1)(A) through (E).  Here, the dispute concerns the third element, causation.  To establish causation, petitioners may rely upon the Vaccine Injury Table, which establishes a presumption of causation for certain vaccine-injury combinations.  However, Ms. Clarke has not alleged an on-Table claim.  Thus, she is necessarily pursuing an off-Table claim.  For off-Table cases, petitioners bear a burden "to show by preponderant evidence that the vaccination brought about [the vaccinee's] injury by providing: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury." Althen v. Sec'y of Health & Hum. Servs., 418 F.3d 1274, 1278 (Fed. Cir. 2005).

## V.    Analysis Part One: Qualifications

Special masters may consider the relative expertise of testifying experts when weighing the value of their opinion.  See Depena v. Sec'y of Health & Hum. Servs., No. 13-675V, 2017 WL 1075101 (Fed. Cl. Spec. Mstr. Feb. 22, 2017), mot. for rev. denied, 133 Fed. Cl. 535, 547-48 (2017), aff'd without op., 730 Fed. App'x 938 (Fed. Cir. 2018); Copenhaver v. Sec'y of Health & Hum. Servs., No. 13-1002V, 2016 WL 3456436 (Fed. Cl. Spec. Mstr. May 31, 2016), mot. for rev. denied, 129 Fed. Cl. 176 (2016).

Here, there is a great disparity in expertise in immunology.  Dr. MacGinnitie has been board-certified in immunology since 2003.  Dr. Shafrir has no specialized training in immunology.  Other opinions have pointed out Dr. Shafrir's relative lack of experience in immunology.  See, e.g., Kinney v. Sec'y of Health & Hum. Servs., No. 18-1522V, 2024 WL 2831616, at *10 n.5 (Fed. Cl. Spec. Mstr. May 8, 2024) ("Dr. Shafrir confirmed that he had no training in immunology subsequent to medical school"); T.M. v. Sec'y of Health & Hum. Servs., No. 08-284V, 2016 WL 11087157, at *12 n.20 (Fed. Cl. Spec. Mstr. Aug. 9, 2016) (suggesting that because Dr. Shafrir is not an immunologist, he does not possess "the professional experience" to opine about homology); Cunningham v. Sec'y of Health & Hum. Servs., No. 13-483V, 2016 WL 4529530, at *16 (Fed. Cl. Spec. Mstr. Aug. 1, 2016) ("despite advancing a theory steeped in immunology, Dr. Shafrir is not himself an immunologist"); R.V. v. Sec'y of Health & Hum. Servs., No. 08-504V, 2016 WL 3882519, at *15 (Fed. Cl. Spec. Mstr. Feb. 19, 2016).

10

Citing some of these cases, the Secretary argues that "special masters have recognized that Dr. Shafrir is not qualified to offer expert testimony in the fields of immunology or pediatric immunology." Resp't's Br. at 21. Ms. Clarke did not answer this argument. See Pet'r's Reply.

Although Ms. Clarke did not contest the general point about Dr. Shafrir's lack of qualifications in immunology, it appears that the Secretary's argument may go a step too far in the sense that the Secretary is contending that Dr. Shafrir "is not qualified to offer expert testimony in the fields of immunology." Resp't's Br. at 21. If an expert is not qualified to offer testimony, then one course is to file a motion to exclude the opinion due to lack of qualifications. See, e.g., Info. Sys. & Networks Corp. v. United States, 136 Fed. Cl. 34, 36 (2018). However, the Secretary did not move to exclude Dr. Shafrir's opinion in whole or in part. Moreover, special masters in the cases the Secretary cited considered Dr. Shafrir's opinion in immunology, although the special masters appropriately gave his opinions less weight. Thus, in accord with these cases, in Ms. Clarke's case, Dr. Shafrir's opinions regarding immunology remain in the record and have been considered, but merit less weight.

In the field of neurology, the competing experts are relatively closer. Dr. Shafrir has been a practicing pediatric neurologist, and he stated in his first report that his "practice has concentrated on autoimmune brain disorders." Exhibit 12 at 1; accord Walters v. Sec'y of Health & Hum. Servs., No. 15-1380V, 2023 WL 3750716, at *15 (Fed. Cl. Spec. Mstr. June 1, 2023) (stating Dr. Shafrir's practice involves many patients with neuro-immune disorders). Thus, Dr. Shafrir is qualified to opine about pediatric epilepsies. However, Dr. Shafrir did not quantify the number of patients he has treated for epilepsy in the previous five years. See Expert Instructions, issued in draft July 1, 2021, ¶ 1.e (asking experts to state how many patients with seizures they have seen).

While Dr. Shafrir is qualified to express opinions in the field of pediatric neurology, Dr. Holmes is even stronger in the field of epilepsy. He reports that he is following hundreds of patients with epilepsy. Dr. Holmes has researched epilepsy and, consequently, published hundreds of articles about epilepsy and seizures. The depth of Dr. Holmes's expertise in the field of epilepsy is reflected in his curriculum vitae, which runs more than 150 pages.

Given Dr. Holmes's level of expertise in epilepsy, he starts in an advantageous position. But, ultimately, whether his opinions are persuasive depends upon his justification for them. See Doyle v. Sec'y of Health & Hum. Servs., 92 Fed. Cl. 1, 8 (2010) ("Mere conclusory opinions—or ones that are nearly so as unaccompanied by elaboration of critical premises—will not suffice as proof of causation, no matter how vaunted or sincere the offeror").

## VI.    Analysis Part Two --- Innate Immune System / Cytokines

The analysis of Dr. Shafrir's two theories begins with the theory involving the innate immune system because the innate immune system responds before the adaptive immune system. See Exhibit 50 (Dr. Shafrir's second report) at 8 (stating in "the early phases of her reaction, immediately following the vaccination, the innate immune system components, such as cytokines, played a major role in her symptoms"); see also Exhibit A (Dr. MacGinnitie's first report) at 11, 14 (explaining that three days is too quick for an antibody-mediated response);

11

Exhibit E (Dr. MacGinnitie's second report) at 6 (repeating that three days is not sufficient time for antibodies to cause harm).

### A.     Timing

The timing prong is taken up first because it is the strongest point in Ms. Clarke's favor. The timing prong actually contains two parts. A petitioner must show the "timeframe for which it is medically acceptable to infer causation" and the onset of the disease occurred in this period. Shapiro v. Sec'y of Health & Hum. Servs., 101 Fed. Cl. 532, 542-43 (2011), recons. denied after remand on other grounds, 105 Fed. Cl. 353 (2012), aff'd without op., 503 F. App'x 952 (Fed. Cir. 2013).

Here, the experts mostly agree that F.C. developed seizures about three days after her vaccination. See Resp't's Br. at 59 ("respondent assumes for the sake of addressing Althen prong three that [F.C.'s seizures] started approximately seventy-two hours after her receipt of the vaccinations on November 7, 2017"). Thus, the ensuing question is whether a cytokine-based theory can explain how seizures can develop within about three days. See Langland v. Sec'y of Health & Hum. Servs., 109 Fed. Cl. 421, 443 (2013) (explaining that the medically acceptable timeframe depends, at least in part, on the theory being offered).

On this point, Dr. Shafrir stands on relatively solid ground. He analogized seizures to encephalopathy, which the Secretary has associated with vaccines containing pertussis that develops within 72 hours.[10] Both seizures and encephalopathies are problems in the central nervous system. It seems that the conditions are similar enough that any process by which a pertussis-containing vaccine could cause encephalopathy within 72 hours could also be a process by which a pertussis-containing vaccine could cause seizures within 72 hours.

Under these circumstances, Ms. Clarke has met her burden of proof that 72 hours is an appropriate interval. But, Ms. Clarke's success on this point does not confer entitlement by itself. See Grant v. Sec'y of Health & Hum. Servs., 956 F.2d 1144 (Fed. Cir. 1992) ("Temporal association is not sufficient, however, to establish causation in fact"). Thus, the remaining two Althen prongs are considered.

### B.     Theory and Logical Sequence

The remaining Althen prongs, a theory causally connecting a vaccine to the injury and a logical sequence of cause and effect, are sometimes considered to raise the questions, "can the vaccine cause the injury" (general causation) and "did the vaccine cause the injury" (specific causation). See Pafford v. Sec'y of Health and Hum. Servs., 451 F.3d 1352, 1355 (Fed. Cir. 2006). Because of the connectedness of these two prongs, they are taken up together.

---

[10] Dr. MacGinnitie asserted that "DTaP [vaccine] is not associated with . . . encephalopathy." Exhibit A at 10. However, the Secretary links pertussis-containing vaccines with encephalopathy on the Vaccine Table.

In a sense, a theory that vaccines cause seizures through cytokines is not crazy. Some cytokines promote inflammation. Fevers, in turn, are one marker for general inflammation. Exhibit E (Dr. MacGinnitie's second report) at 1-2. Thus, when petitioners put forward a cytokine-based theory to explain seizures, special masters have looked to whether the child-recipient of the vaccine experienced a fever. See, e.g., Bechel v. Sec'y of Health and Hum. Servs., 168 Fed. Cl. 602, 620-21 (2023) (ruling that the special master did not err in finding lack of support for the theory that vaccines can cause afebrile seizures and noting that the child did not experience a fever); Burchianti v. Sec'y of Health & Hum. Servs., No. 15-918V, 2023 WL 9469065, at *26 (Fed. Cl. Spec. Mstr. Apr. 11, 2023) (distinguishing literature about febrile seizures from literature about afebrile seizures); Carroll on behalf of J.W. v. Sec'y of Health & Hum. Servs., No. 19-1125V, 2025 WL 2476424, at *28 (Fed. Cl. Spec. Mstr. July 31, 2025) ("there is no evidence of a fever or that a fever triggered the seizures.").

But, F.C. did not have a fever around the time of her initial seizures. Exhibit 2 at 45. Thus, if Dr. Shafrir is opining that a pertussis-containing vaccine can cause seizures, then Ms. Clarke's case would falter in Althen prong two, because F.C. did not respond in the way the expert's theory predicted (i.e., she did not develop a fever). See Burchianti, 2023 WL 9469065, at * 27 ("A.B.'s clinical course is not consistent with Dr. Kinsbourne's theory that the MMR vaccination triggered proinflammatory cytokines, causing an afebrile seizure that led to the development of focal epilepsy. . . . [A.B.] never presented with fever or any other inflammatory signs").

Alternatively, Dr. Shafrir might be attempting to fulfill the first prong of Althen by arguing that pertussis-containing vaccines can cause seizures without a fever. In this context, Ms. Clarke cites three articles, of which two are easily distinguishable. See Pet'r's Br. at 29.[11] The potentially relevant remaining article is by Kiarash Riazi and colleagues.[12]

The significance of the Riazi article is uncertain. Riazi is included among the references in Dr. Shafrir's second report, more specifically "reference 3." Exhibit 50 at 12. However, it appears that Dr. Shafrir never actually disclosed an opinion about Riazi. See id. at 3 (discussing both reference 2 and reference 4 without discussing reference 3). It follows that Dr.

---

[11] Two articles concern children with genetic mutations in their SCN1A genes. Exhibit 47 (Anne M. McIntosh et al., Effects of vaccination on onset and outcome of Dravet syndrome: A retrospective study, 9 LANCET. NEUROL. 592 (2010)) and Exhibit 48 (Nelia Zamponi, Vaccination and Occurrence of Seizures in SCN1A Mutation-Positive Patients: A Multicenter Italian Study, 50 PEDIATR. NEUROL. 228 (2014)). Special masters have consistently found that the SCN1A genetic mutation alone causes the seizure disorder in those cases. See Vinesar v. Sec'y of Health & Hum. Servs., No. 18-440V, 2023 WL 5427935, at *1-20 (Fed. Cl. Spec. Mstr. July 28, 2023) (discussing cases), mot. for rev. denied, 170 Fed. Cl. 681 (2024), aff'd in nonprecedential op. 2025 WL 2945665 (Fed. Cir. 2024).

[12] Kiarash Riazi et al., Microglial activation and TNF alpha production mediate altered CNS excitability following peripheral inflammation, 105 PROC. NAT'L ACAD. SCI. 17151 (2008); filed as Exhibit 53.

MacGinnitie, also, did not discuss Riazi.  See Exhibit E.  Without guidance from an expert, the analysis of Riazi is necessarily tentative.

A review of Riazi reveals the following.  The researchers worked with adult male rats.  For one group of rats, the researchers administered a substance (2,4,6-trinitrobenzene sulfonic acid (TNBS)) into each rat's colon to induce inflammation in the rat's guts.  Exhibit 53 (Riazi) at 17151 (abstract) and 17154 (material and methods).  Another group received an injection of saline solution to serve as controls.  The researchers also delivered pentylenetetrazole (PTZ; a GABAergic antagonist) "to evoke clinical seizures."  Id.[13]  After comparing outcomes, the researchers found that "Rats treated with TNBS showed increased susceptibility to PTZ seizures that was strongly correlated with the severity and progression of intestinal inflammation." Id. at 17151.

Despite able advocacy from her attorney, Ms. Clarke has not demonstrated that the Riazi experiment is a reliable basis for explaining what happened to F.C.  To start, Riazi is an animal model, which may (or may not) represent what happens in people.  Moreover, as the Secretary points out, there is "no evidence that F.C. had peripheral inflammation, and there is no evidence that F.C. had intestinal inflammation."  Resp't's Br. at 45.  Perhaps more significantly, the Riazi researchers induced the seizures in rats by giving them PTZ.  Peripheral inflammation, itself, seems insufficient to generate seizures.

A (tentative) finding that Riazi is not a reliable basis for finding that peripheral inflammation leads to harm in the central nervous system is consistent with the only case in which a special master assessed this 2008 article.  Dr. Frye, the petitioner's expert in Bast v. Sec'y of Health & Hum. Servs., No. 01-565V, 2012 WL 6858040, *30 (Fed. Cl. Spec. Mstr. Dec. 20, 2012), relied, in part, on this article to support a theory that vaccines can induce oxidative stress in the periphery, and this inflammation leads to neurodevelopmental disorders, including intractable epilepsy.  The special master noted that the Secretary's expert stated that the amount of inflammation from a vaccine is much less.  Although the special master did not specifically refer to Riazi in the analysis, the special master found that petitioner was not entitled to compensation.  Id. at *32 ("The articles on which Dr. Frye relied were problematic for petitioner because they failed to lend the supportive weight to petitioner's theory that Dr. Frye proposed").  The special master's denial of compensation was upheld.  See M.S.B. ex rel. Bast v. Sec'y of Health and Hum. Servs., 117 Fed. Cl. 104, 123-25 (2014), appeal dismissed, No. 2014-5141 (Fed. Cir. Oct. 15, 2014).

Accordingly, in Ms. Clarke's case, there is not sufficient evidence to find that the theory that vaccines cause afebrile seizures is reliable.  A long line of cases have rejected a theory that vaccines can cause afebrile seizures.  See, e.g., Burchianti v. Sec'y of Health & Hum. Servs., No.

---

[13] An "antagonist" blocks the working of a substance.  Dorland's Illust. Med. Dictionary 96 (33rd ed).  "GABA," which refers to γ aminobutyric acid, can inhibit seizures.  See Id. at 61; see also Taylor v. Sec'y of Health & Hum. Servs., No. 05-1133V, 2012 WL 4829293, at *8 (Fed. Cl. Spec. Mstr. Sept. 20, 2012), mot. for rev. denied, 108 Fed. Cl. 807 (2013).

15-918V, 2023 WL 9469065, at *22 (Fed. Cl. Spec. Mstr. Apr. 11, 2023) ("petitioner has not demonstrated a sound and reliable theory to demonstrate how the MMR vaccine could rapidly trigger inflammatory cytokines to trigger afebrile seizures within twenty-four hours of vaccination"); Carroll, 2025 WL 2476424, at *27-28 (crediting and quoting a report from a respondent's expert that stated cytokine levels after vaccinations are not "sufficient to lower seizure thresholds and influence the development of cytokine mediated afebrile seizures" and citing cases); Nance v. Sec'y of Health & Hum. Servs., No. 06–730V, 2010 WL 3291896, at *8 (Fed. Cl. Spec. Mstr. July 30, 2010) (citing cases); Salmond v. Sec'y of Health and Hum. Servs., No. 91-123V, 1999 WL 778528, at *6 (Fed. Cl. Spec. Mstr. Sept. 16, 1999); Cf. Thompson v. Sec'y of Health & Hum. Servs., No. 15-671, 2023 WL 21234, at *24 (Fed. Cl. Spec. Mstr. Jan. 3, 2023) (citing cases in which vaccines were found to cause febrile seizures). Dr. Shafrir has not demonstrated that he has the immunologic expertise or the support in the literature to upset these determinations.

For these reasons, Ms. Clarke does not prevail upon her theory based upon the innate immune system / cytokines.

## VII.    Analysis Part Three --- Adaptive Immune System / Antibodies

The other theory that Dr. Shafrir and Ms. Clarke advance involves the adaptive immune system, which includes antibodies. See Exhibit 12 at 12; Pet'r's Br. at 25. The basic theory is that the vaccine prompts the body to create antibodies, which are misdirected at the body's own tissues leading to an autoimmune reaction. This theory is problematic for multiple reasons.

### A.    Diagnosis

Preliminarily, the theory posits an autoimmune reaction. Dr. Shafrir declares that F.C. had "had autoimmune epilepsy." Exhibit 50 at 11. However, Dr. Holmes disputes this diagnosis for F.C. See Exhibit C at 10.

When the parties dispute the diagnosis, special masters may resolve whether preponderant evidence supports the injury the vaccine is alleged to have caused. Broekelschen v. Sec'y of Health and Hum. Servs., 618 F.3d 1339, 1346 (Fed. Cir. 2010). To the extent that Ms. Clarke is arguing that epilepsy and autoimmune epilepsy "are on the same spectrum and share the same, or substantially similar pathogenesis," Pet'r's Br. at 3, this argument lacks persuasiveness. In this portion of her brief, Ms. Clarke did not cite any evidence regarding the same spectrum. Further, the Secretary argued (also without citing any evidence) that "non-autoimmune epilepsy and autoimmune epilepsy do not share the same or a substantially similar pathogenesis, as one is non-autoimmune and other is autoimmune." Resp't's Br. at 15. Ms. Clarke did not rebut this basic point. See Pet'r's Reply. Although the pathogenesis of some disorders of the central nervous system is autoimmune, some disorders of the central nervous systems are not autoimmune in origin. See Tipps v. Sec'y of Health & Hum. Servs., No. 16-867V, 2023 WL 183398, at *22 (Fed. Cl. Spec. Mstr. Dec. 9, 2022) (discussing encephalitis).

Ms. Clarke put forward little (or maybe no) persuasive evidence that F.C. suffered from autoimmune epilepsy. She argues: "The fact that she [F.C.] was never tested for it [autoimmune epilepsy] does not discount the possibility. Certainly there is no evidence in the medical records that discounts the diagnosis." Pet'r Br. at 21. Essentially, Ms. Clarke is arguing that because

15

potentially relevant testing was not done, autoimmune epilepsy remains a possibility.  But, Ms. Clarke cannot turn a lack of evidence regarding the diagnosis of autoimmune epilepsy into preponderant evidence favoring a finding of autoimmune epilepsy.  Moreover, the lack of testing, to a degree, supports the Secretary's view that F.C.'s epilepsy was "short-lived" and not autoimmune.  Resp't's Br. at 17.  As Dr. Holmes explained, doctors treating F.C. did not order tests for antibodies probably because the treating doctors did not consider autoimmune epilepsy a possibility.  Exhibit F at 2; see also Exhibit C at 8.

Drawing upon criteria from Suleiman and Dale, Dr. Holmes prepared a chart about the diagnostic criteria for autoimmune epilepsy and F.C.'s presentation.

| Indications of autoimmune encephalitis | Present in FC? | Explanation |
|---|---|---|
| **Clinical features** | | |
| - Focal seizures, particularly focal motor and focal cognitive, secondarily generalized seizures | Yes | Limited w/u due to benign course |
| - Seizures clusters; status epilepticus | No | Responded well to levetiracetam |
| - Seizures and epilepsy of "unknown" cause | Yes | |
| - Refractory seizures | No | |
| - Associated features: encephalopathy, movement disorder, neuropsychiatric symptoms, cognitive or memory impairment | No | |
| - History of other autoimmune disease (personal or family) | No | |
| **Imaging and other investigations** | | |
| - Positive CSF findings suggestive of inflammation (pleocytosis, elevated neoptterin, oligoclonal bands) | No | |
| - Inflammatory MRI changes of high T2 or FLAIR signal in medial temporal structures, cortical or subcortical areas, as well as cerebellum and basal ganglia | No | |
| - Focal (or multifocal) electrographic changes including slowing and/or epileptiform activity, particularly involving temporal lobe(s) | No | |
| - Histopathological findings compatible with inflammation (such as lymphocytic infiltrates) on biopsy | No | |
| - Positive cell-surface neuronal autoantibodies (serum or CSF) | No | |
| **Treatment response** | | |
| - Resistance to conventional anti-seizure drugs | No | No indication for immunotherapy in child with benign epilepsy. |
| - Response to immunotherapy (steroids, immunoglobulins, immunosuppressants) | No | |
| **No other explanation** | Yes | Genetic testing was not pursued presumably due to the benign course of the epilepsy. |

Exhibit C at 8.  Dr. Holmes's chart is credited for two reasons.  First, Dr. Holmes has extensive experience in the field of epilepsy.  In the undersigned's experience, Dr. Holmes tends to be accurate and precise.  Second, and more importantly, Dr. Shafrir did not contest how Dr. Holmes was assessing autoimmune epilepsy.  See Exhibit 50.  Although Dr. Shafrir did assert that F.C. suffered from autoimmune epilepsy, he did not persuasively explain the basis for his opinion.

Normally, a petitioner's failure to demonstrate that the vaccinee suffered from the condition that the vaccine allegedly caused ends the case.  "In the absence of a showing of the

very existence of any specific injury of which the petitioner complains, the question of causation is not reached." Lombardi v. Sec'y of Health & Hum. Servs., 656 F.3d 1343, 1353 (Fed. Cir. 2011). This is what initially happened in Mager v. Sec'y of Health & Hum. Servs., No. 14-820V, 2021 WL 3737056, at *11 (Fed. Cl. Spec. Mstr. July 29, 2021). However, this result was not upheld on a motion for review. Mager v. Sec'y of Health and Hum. Servs., 158 Fed. Cl. 136 (2022).

Here, the opinion from the Court of Federal Claims in Mager does not control the outcome for several reasons. First, Mager is not controlling precedent. Boatmon v. Sec'y of Health & Hum. Servs., 941 F.3d 1351, 1358 (Fed. Cir. 2019). Second, Ms. Clarke did not claim F.C.'s case resembles Mager. She did not cite Mager in either her brief or reply. Third, the facts (in the form of reports from experts) differ in at least two respects. In Mager, the Court of Federal Claims was impressed with a difference between what the Court called "Autoimmune Epilepsy" and "autoimmune epilepsy." 158 Fed. Cl. at 152. However, Dr. Shafrir claims that F.C. had "autoimmune epilepsy." Exhibit 50 at 12; but see Exhibit 71 at 1 (adding that her condition might be mild). A second difference is the presence of challenge-rechallenge in Mager, but not in F.C.'s case. See 158 Fed. Cl. at 154.

Nonetheless, out of an abundance of caution, the analysis will proceed to consider the Althen factors.

## B.    Causation-in-Fact / Althen Analysis

Even if Ms. Clarke established that F.C.'s epilepsy was autoimmune in origin, Ms. Clarke is required to establish other elements to receive compensation as well. She must present preponderance evidence to fulfill each of the Althen prongs.

### 1.    Medical Theory

#### a)    Appellate Precedents regarding Molecular Mimicry

Because special masters are often called upon to evaluate the persuasiveness of the theory of molecular mimicry, the Court of Federal Claims and the Court of Appeals for the Federal Circuit have considered molecular mimicry in their appellate role. In December 2019, the undersigned identified the leading precedents as W.C. v. Sec'y of Health & Hum. Servs., 704 F.3d 1352 (Fed. Cir. 2013), and Caves v. Sec'y of Dep't. of Health & Hum. Servs., 100 Fed. Cl. 119 (2011), aff'd sub nom., 463 F. App'x 932 (Fed. Cir. 2012). Tullio v. Sec'y of Health & Hum. Servs., No. 15-51V, 2019 WL 7580149, at *12-14 (Fed. Cl. Spec. Mstr. Dec. 19, 2019), mot. for rev. denied, 149 Fed. Cl. 448 (2020). While Tullio describes those cases in more detail, their essence appears to be that although molecular mimicry is accepted in some contexts, special masters may properly require some empirical evidence to show that a particular vaccine can cause a particular disease.

Over the next several years, appellate authorities reviewing decisions involving molecular mimicry have generally endorsed the approach of looking for some evidence that persuasively shows that a portion of a vaccine resembles a portion of human tissue, which contributes to causing the disease, and that the immune system will respond to the relevant amino acid

sequence. Chronologically, the list of more recent appellate cases begins with the opinion in Tullio, which denied the motion for review. 149 Fed. Cl. 448, 467-68 (2020).

Another example in which the Court of Federal Claims held that the special master did not elevate the petitioner's burden of proof in the context of evaluating the theory of molecular mimicry is Morgan v. Sec'y of Health & Hum. Servs., 148 Fed. Cl. 454, 476-77 (2020), aff'd in non-precedential opinion, 850 F. App'x 775 (Fed. Cir. 2021). In Morgan, the Chief Special Master found that petitioner had not presented persuasive evidence about a relevant antibody. Id. at 477. The Chief Special Master also noted that the articles about the relevant disease do not list the wild flu virus as potentially causing the disease. Id. When examining this analysis, the Court of Federal Claims concluded: "the Chief Special Master did not raise the burden of causation in this case; petitioner simply failed to meet it." Id.

The Federal Circuit also evaluated the Chief Special Master's approach in Morgan. The Federal Circuit concluded: "We discern no error in the special master's causation analysis." 850 F. App'x 775, 784 (Fed. Cir. 2021).

Most other recent appellate cases follow this path. See, e.g., Dennington v. Sec'y of Health & Hum. Servs., 167 Fed. Cl. 640, 653-56 (2023) (finding the special master did not err in rejecting theory of molecular mimicry where petitioner did not specifically link vaccine and injury), mot. for review den'd, 167 Fed. Cl. 640 (2023), appeal dismissed, No. 2024-1214, 2024 WL 1255318 (Fed. Cir. Mar. 25, 2024); Duncan v. Sec'y of Health & Hum. Servs., 153 Fed. Cl. 642, 661 (2021) (finding the special master did not err in rejecting a bare assertion of molecular mimicry); Caredio v. Sec'y of Health & Hum. Servs., No. 17-79V, 2021 WL 6058835, at *11 (Fed. Cl. Dec. 3, 2021) (indicating that a special master did not err in requiring more than homology and citing Tullio); Yalacki v. Sec'y of Health & Hum. Servs., 146 Fed. Cl. 80, 91-92 (2019) (ruling that special master did not err in looking for reliable evidence to support molecular mimicry as a theory); but see Patton v. Sec'y of Health & Hum. Servs., 157 Fed. Cl. 159, 169 (2021) (finding that a special master erred in requiring petitioner submit a study to establish medical theory causally connecting flu vaccine to brachial neuritis).

This background information about molecular mimicry and how appellate authorities have treated molecular mimicry is helpful to understanding the way Dr. Shafrir attempts to connect the DTaP vaccine and epilepsy and the analysis of his theory.

### b) Evidence regarding Molecular Mimicry

Here, Dr. Shafrir's opinion about molecular mimicry in the specific context of a relevant vaccine causing epilepsy is thin. In the first report, Dr. Shafrir identified a few articles about vaccines and epilepsy. Exhibit 12 at 14.[14] Dr. MacGinnitie criticized Dr. Shafrir's opinion.

---

[14] Dr. Shafrir also cited other materials about molecular mimicry as a general theory. However, as recounted in the appellate precedents on molecular mimicry, molecular mimicry has been proposed in multiple contexts. But, the relevant question is whether molecular mimicry is a reliable theory in the context of Ms. Clarke's case.

Exhibit A at 9-10.  But, Dr. Shafrir did not really answer these criticisms.  See Exhibit 50 at 4; see also T.M., 2016 WL 11087157, at *29 (rejecting Dr. Shafrir's reliance on molecular mimicry because, in part, Dr. Shafrir's lack of direct knowledge on the topic).

To a degree, Ms. Clarke's brief attempts to shore up weaknesses in Dr. Shafrir's reports. Ms. Clarke presented two block quotes from an article that Dr. Shafrir cited but did not discuss in detail:

> Sequence matching analyses show that *Clostridium tetani* neurotoxin shares numerous pentapeptides (68, including multiple occurrences) with 42 human proteins that, when altered, have been associated with epilepsy.  Such a peptide sharing is higher than expected, nonstochastic, and involves tetanus toxin-derived epitopes that have been validated as immunopositive in the human host.  Of note, an unexpected high level of peptide matching is found in mitogen-activated protein kinase 10 (MKIO), a protein selectively expressed in hippocampal areas.  On the whole, the data indicate a potential for cross-reactivity between the neurotoxin and specific epilepsy-associated proteins and may help evaluate the potential risk for epilepsy following immune responses induced by tetanus infection. Moreover, this study may contribute to clarifying the etiopathogenesis of the different types of epilepsy.

Lucchese[15], Ex. 42, p. 1. More specifically:

> the peptide overlap occurs in human proteins canonically associated with epilepsy such as gamma-aminobutyric acid receptor subunit alpha1 (GBRAl), gamma-aminobutyric acid type B receptor subunit 1 (GABR1), sodium channel protein subunits (SCNIA, SCN2A, SCN8A, and SCN9A), and calcium-activated potassium channel subunit alpha-I (KCMAI).

Pet'r's Br. at 26.  Because Dr. Shafrir did not discuss this article in detail, Ms. Clarke's attorney is filling in details that might, in an ideal world, have been provided by Dr. Shafrir.

Even with Lucchese, Ms. Clarke's evidence and argument with respect to molecular mimicry as a reliable basis to explain how the DTaP vaccine can cause epilepsy are unpersuasive.  First, Lucchese is not an easy article, particularly the math.  More unpacking of the article from either Dr. Shafrir or Ms. Clarke's attorney might have made the article more understandable.  See Moriarty v. Sec'y of Health and Hum. Servs., 844 F.3d 1322, 1330 (Fed. Cir. 2016) (stating "if the technical complexity of a particular study is such that the relevance of the medical study or its particular findings cannot be understood by the special master without expert assistance that was not provided, then the special master may conclude that this evidence

---

[15] Guglielmo Lucchese, The Peptide Network between Tetanus Toxin and Human Proteins Associated with Epilepsy, 2014 EPILEPSY RES. TREAT. 1 (2014); filed as Exhibit 42.

or portion of the evidence is entitled to little or no weight"). Second, Lucchese studied the "*Clostridium tetani* neurotoxin." On the other hand, the DTaP vaccine contains a tetanus toxoid, not the toxin. Special masters have recognized this difference. Dean v. Sec'y of Health & Hum. Servs., No. 13-808V, 2017 WL 2926605, at *6 (Fed. Cl. Spec. Mstr. June 9, 2017); Bubb v. Sec'y of Health & Hum. Servs., No. 01-721V, 2005 WL 1025707 at *1 n.3 (Fed. Cl. Spec. Mstr. Apr. 29, 2005); but see Escalera v. Sec'y of Health & Hum. Servs., No. 14-431, 2016 WL 7422308, at *13 (Fed. Cl. Spec. Mstr. Nov. 23, 2016). Dr. Shafrir has not shown that what might be known about the tetanus toxin should be extended to the tetanus toxoid. Cf. Zumalt v. Sec'y of Health and Hum. Servs., 146 Fed. Cl. 525, 539 (2019) (ruling that the special master did not err in finding that petitioner failed to establish that any remaining pertussis toxin could cause neurologic damage).

Third, as Dr. MacGinnitie explained, a showing that two substances share some homology does not mean that the two substances are cross-reactive. Exhibit A at 9.

Fourth, other special masters have either criticized Lucchese or declined to follow it. See Walters v. Sec'y of Health & Hum. Servs., No. 15-1380, 2023 WL 3750716 at *32 (Fed. Cl. Spec. Mstr. June 1, 2023) (citing Oliver); Oliver v. Sec'y of Health & Hum. Servs., No. 10-394V, 2017 WL 747846, at * 13 (Fed. Cl. Spec. Mstr. Feb. 1, 2017), mot. for rev. denied, 133 Fed. Cl. 341 (2017), aff'd, 900 F.3d 1357 (Fed. Cir. 2018). These assessments, although not binding, carry additional weight given the lack of discussion from the parties and their experts.

Accordingly, for these reasons, Ms. Clarke has not met her burden for Althen prong one.

## C.    Logical Sequence of Cause and Effect

The second Althen prong requires preponderant evidence for "a logical sequence of cause and effect showing that the vaccination was the reason for the injury." Althen, 418 F.3d at 1278. With respect to this prong, the Federal Circuit has instructed special masters to consider carefully the views of a treating doctor. Capizzano v. Sec'y of Health & Hum. Servs., 440 F.3d 1317, 1326 (Fed. Cir. 2006).

Ms. Clarke's arguments on this prong are thin as well. In her primary brief, across about one page, Ms. Clarke essentially sets forth a chronology of events in which F.C. received the DTaP vaccine before she developed epilepsy and that Ms. Clarke, herself, associated the vaccines with F.C.'s epilepsy. Pet'r's Br. at 30-31. In her reply brief, Ms. Clarke quotes a portion of Dr. Shafrir's report in which Dr. Shafrir essentially restates the theory that F.C. likely produced antibodies causing epilepsy. Pet'r's Reply at 2.

These points are not persuasive. First, a simple recitation of events in which a vaccination preceded the start of a disease and no other cause for the disease has been identified does not, without more, show that a petitioner is entitled to compensation. Moberly, 592 F.3d at 1323. Second, Ms. Clarke's good-faith belief that the vaccine harmed her daughter also is insufficient. Special masters are obligated not to rely upon "the claims of a petitioner alone, unsubstantiated by medical records or by medical opinion." 42 U.S.C. § 300aa-13(a). Third, restating the theory without citing any evidence that the vaccinee responded as the theory predicted leaves a gap in petitioner's claim. In this sense, the relative lack of evidence about autoimmunity in F.C. weighs against the claim. See Carroll, 2025 WL 2476424, at *27 ("There

20

is no evidence here of an autoimmune diagnosis, so Dr. Akbari's . . . molecular mimicry theory does not fit the factual context"). Fourth and finally, Ms. Clarke has not identified any evidence that a treating doctor linked F.C.'s epilepsy to the preceding vaccinations. See Pet'r's Br. at 30-31; Pet'r's Reply at 2; see also Order for Briefs, issued Dec. 19, 2023, at 7 (requesting this information). Dr. MacGinnitie held the opinion that F.C.'s treating neurologists did not associate the vaccines and the epilepsy. Exhibit A at 13. This opinion has not been rebutted by citing a medical report in which a treating doctor did link the two.

Accordingly, Ms. Clarke has not met her burden of proof for the second Althen prong.

**D.     Timing**

The remaining Althen prong actually contains two parts. A petitioner must show the "timeframe for which it is medically acceptable to infer causation" and the onset of the disease occurred in this period. Shapiro, 101 Fed. Cl. at 542-43 (2011).

Although Dr. Shafrir's opinion for timing on the theory involving cytokines was potentially creditable, his opinion regarding timing regarding an autoimmune reaction was vague. To start, as explained above, an autoimmune reaction is not likely to occur within three days. Dr. MacGinnitie was persuasive on this point. See Exhibit A at 11, 14; Exhibit E at 6. Dr. Shafrir's and Ms. Clarke's reliance on a portion of the 2012 report from the Institute of Medicine discussing lag phases and log phases overlooks that the two phases are sequential. There is a lag phase in which memory B cells are waiting to be called to activate. Then, there is a logarithmic phase in which the memory B cells produce more and more antibodies. Then, the antibodies must locate the relevant host tissues and cause sufficient damage that epilepsy ensues. Thus, an autoimmune reaction cannot explain why F.C. started having seizures about three days after the vaccination. See Forrest v. Sec'y of Health & Hum. Servs., No. 14-1046V, 2019 WL 925495, at *6 (Fed. Cl. Spec. Mstr. Jan. 28, 2019).

In a respect, Dr. Shafrir acknowledges this limitation and appears to attempt to work around it. Dr. Shafrir maintains that the cytokine-driven reaction (discussed above) "persisted because of the production of autoantibodies against brain components, similar to what is seen in autoimmune epilepsy." Exhibit 12 at 12.[16] As to the persistence, Dr. Shafrir's opinion lacks detail. He does not state when the autoantibodies developed. Similarly, nothing in Dr. Shafrir's opinion suggests when F.C. manifested any transition from an initial disease course based upon cytokines to a persistent disease course based upon autoantibodies. These omissions generally constitute gaps in Dr. Shafrir's opinion and overall reduce its persuasiveness.

---

[16] In the next sentence, Dr. Shafrir's report mentions "epitope spreading" and "bystander activation." However, Ms. Clarke did not assert any argument based upon either epitope spreading or bystander activation. See Pet'r's Br. Thus, these concepts are not further discussed in this decision. See Vaccine Rule 8(f)(1) ("Any fact or argument not raised specifically in the record before the special master will be considered waived and cannot be raised by either party in proceedings on review of a special master's decision").

21

In any event, the lack of clarity as to timing beyond three days is not the primary problem with Dr. Shafrir's opinion on the antibody theory. As with the theory based on cytokines, if Ms. Clarke were found to be persuasive on prong three, she would still not be entitled to compensation.

### E.    Summary on Antibody Theory

As explained above, there is little or no persuasive evidence that F.C.'s epilepsy involved autoantibodies. Thus, Ms. Clarke's case fails on the fundamental step of diagnosis. In addition, as measured by relevant precedents on molecular mimicry, Dr. Shafrir has not set out a reliable theory to explain how vaccines can cause epilepsy. Finally, there is a lack of persuasive evidence regarding the proposed logical sequence of cause and effect. For these reasons, Ms. Clarke has not established that she is entitled to compensation based upon the adaptive immune system / antibody-based theory.

## VIII.   Resolution on the Papers is Appropriate

Special masters possess discretion to decide whether an evidentiary hearing will be held. 42 U.S.C. § 300aa-12(d)(3)(B)(v) (promulgated as Vaccine Rule 8(c) & (d)), which was cited by the Federal Circuit in Kreizenbeck v. Sec'y of Health & Hum. Servs., 945 F.3d 1362, 1365 (Fed. Cir. 2020). The Vaccine Act and Rules not only contemplate but encourage special masters to exercise their discretion and make decisions on the papers rather than via evidentiary hearing in cases where they conclude that resolution on the papers will properly and fairly adjudicate the case. 42 U.S.C. § 300aa–12(d)(2)(D); Vaccine Rule 8(d). The choice to resolve cases on the papers has been affirmed on appeal. See D'Toile v. Sec'y of Health & Human Servs., No. 15-85V, 2018 WL 1750619, at *2 (Fed. Cir. Apr. 12, 2018); see also Hooker v. Sec'y of Health & Human Servs., No. 02-472V, 2016 WL 3456435, at *21 n.19 (Fed. Cl. Spec. Mstr. May 19, 2016) (citing numerous cases upholding special masters' decisions to decide cases on the papers in lieu of hearing). A consideration is whether both parties, especially the losing party, had a fair opportunity to present its evidence and arguments.

Here, Ms. Clarke enjoyed ample opportunities to present her evidence. Before the parties consulted any experts, they were advised that the reports could constitute the expert's testimony. Draft Instructions, issued Jul. 1, 2021; Order, issued Aug. 17, 2021 (adopting draft instructions). Ms. Clarke had the last word regarding experts as Dr. Shafrir wrote three reports as opposed to the Secretary's experts who each wrote two reports.

Similarly, Ms. Clarke also enjoyed ample opportunities to argue her case. In the context of briefing, she again had the last word. She filed a reply brief.

An evidentiary hearing is not likely to change the outcome for Ms. Clarke. Dr. Shafrir's relative lack of experience in immunology will not change. See Section V, above. As to the cytokine-based theory, oral testimony from either Ms. Clarke or Dr. Shafrir is unlikely to disrupt a critical fact: F.C. did not have a fever when she experienced her first seizure. See Exhibit 2 at 46 (noting "No recent fevers"); see also Exhibits 8 and 9 (Ms. Clarke's affidavits describing the seizure and F.C.'s symptoms but making no mention of a fever). To be sure, some oral testimony from Dr. Shafrir about the Riazi article might have been helpful, but Dr. Shafrir could have expressed his opinions about the Riazi article in his written report. It bears repeating that

although Dr. Shafrir included Riazi among his references, his report does not actually cite Riazi in the body of his report.

As to the antibody-based theory, as Dr. Holmes stated in both of his reports, there is little or no persuasive evidence that F.C. suffered autoimmune epilepsy. Dr. Shafrir has had a fair opportunity to express why Dr. Shafrir thinks F.C.'s problem was autoimmune in origin in his reports. Dr. Shafrir ordinarily would not be allowed to express a new basis for his opinion for the first time in any oral testimony. See Simanski v. Sec'y of Health and Hum. Servs., 671 F.3d 1368, 138-821 (Fed. Cir. 2012). As with the Riazi article, more disclosure from Dr. Shafrir about the Lucchese article could have been beneficial. But, the finding that Dr. Shafrir's antibody-based theory rests on much more than the lack of explanation about the Lucchese article. For example, F.C.'s treating doctors did not associate the vaccines with causing her seizures. This lack of notation will not change with oral testimony from either Ms. Clarke or Dr. Shafrir. In short, Ms. Clarke is being found not to have met her burden of proof due to a lack of persuasive evidence, not because of any procedural misstep.

## IX.    Conclusion

As a mother of a child who experienced seizures within a few days of receiving vaccinations, Ms. Clarke maintained that the vaccinations caused the seizures. Such a reaction is understandable, especially when the doctors did not propose any cause for the seizures. However, Ms. Clarke's good faith belief is not enough. Her case must be evaluated upon the evidence and the evidence, as set forth above, is lacking. Thus, she is not entitled to compensation.

The Clerk's Office is instructed to enter judgment in accord with this decision unless a motion for review is filed. Information about filing a motion for review, including the deadline, can be found in the Vaccine Rules, which are available on the website for the Court of Federal Claims.


**IT IS SO ORDERED.**


s/Christian J. Moran
Christian J. Moran
Special Master

23